UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TIMOTHY BOYLE, | : | |
| Plaintiff, | : | |
| V. | : | Civil Action No. 3:16-cv-30006 |
| FRANKLIN COUNTY OFFICE OF SHERIFF, | : | |
| Defendant. | : | |

**COMPLAINT and DEMAND FOR JURY**

Plaintiff Timothy Boyle (hereafter "Mr. Boyle"), by way of complaint against Defendant Franklin County Office of Sheriff states as follows:

**INTRODUCTION**

1. Mr. Boyle brings this action for injunctive relief, and compensatory and punitive damages against the Franklin County Office of Sheriff for its persistent failure and refusal to offer Mr. Boyle reasonable accommodations which he required in order to successfully perform the essential functions of his job and for the discriminatory termination of his employment based upon his disability, in violation of the Americans with Disabilities Act and the Massachusetts laws against discrimination, , and for acts of retaliation against him for asserting his rights under these laws.

2. Mr. Boyle further seeks equitable relief designed to assure that the Defendant discontinues policies and practices which serve to foster discrimination against physically disabled employees of the Franklin County Office of Sheriff.

**JURISDICTION and VENUE**

3. This suit is brought and jurisdiction lies pursuant to 42 U.S.C. §§ 12117 and 2000e-5(f), as well as 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 28 U.S.C. §§ 2201 and 2202.

4. All conditions precedent to jurisdiction under 42 U.S.C. § 2000e-5(f), have occurred or been complied with:

a. A discrimination complaint was filed with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission (hereafter "EEOC") on March 3, 2015, within 300 days of the discriminatory actions alleged in the charge.

b. A notification of right to sue was received by Mr. Boyle from the U.S. Equal Employment Opportunity Commission on October 13, 2015.

c. This complaint has been filed this Complaint within 90 days of receipt of the right to sue notification from the U.S. Equal Employment Opportunity Commission.

5. This court has supplemental jurisdiction over related state law claims asserted by the plaintiff in this action pursuant to 28 U.S.C. § 1367(a).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) insofar as all the discriminatory employment practices alleged in this complaint were committed within the County of Franklin in the Commonwealth of Massachusetts, the Plaintiff resides in the County of Franklin in the Commonwealth of Massachusetts, and the

Defendant is a governmental entity with its principal office and operations in the County of Franklin in the Commonwealth of Massachusetts.

**PARTIES**

7. Mr. Boyle a twenty-nine year old white male and resides in Greenfield, MA.

8. Defendant Franklin County Office of Sheriff (hereafter “the Sheriff’s Office”) is a governmental agency with its principal place of business at 160 Elm Street, Greenfield, MA 01301. At all times relevant to this Complaint, the Sheriff’s Office operated the Franklin County House of Correction (hereafter the “House of Correction”).

9. Respondent Sheriff’s Office is a “person” within the meaning of M.G.L. c. 151B, § 1.

10. Respondent Sheriff’s Office employs 6 or more employees, and is an “employer” within the meaning of M.G.L. c. 151B, § 1.

11. Respondent Sheriff’s Office is a “person” within the meaning of Section 12111(7) of the Americans with Disabilities Act (hereafter “ADA”), as codified at 42 U.S.C. §12101, et seq..

12. Respondent Sheriff’s Office is engaged in an industry affecting commerce and employs 15 or more employees, and is an “employer” within the meaning of Section 12111(5) of the Americans with Disabilities Act (hereafter “ADA”), as codified at 42 U.S.C. §12101, et seq.

**STATEMENT OF FACTS**

**A. MR. BOYLE’S EMPLOYMENT QUALIFICATIONS**

13. Mr. Boyle graduated with a Bachelor of Arts degree in Psychology from the University of Colorado in Boulder, CO in December 2008.

14. Mr. Boyle received a Master's degree in Forensic Psychology from Argosy University in June 2011.

15. In June 2012, Mr. Boyle successfully completed a five month Training Course for Reserve/Intermittent Police Officers conducted by The Municipal Police Training Committee.

16. Mr. Boyle also completed training courses in Suicide Prevention and Standardized Field Sobriety Testing offered by The Municipal Police training Committee.

17. In February 2012, Mr. Boyle completed courses on the National Incident Management System and Incident Command System through the Emergency Management Institute of the Federal Emergency Management Agency.

18. In July 2012, Mr. Boyle completed a course in the Reid Technique of Interviewing and Interrogation.

19. Mr. Boyle is certified as an Emergency Medical Technician (EMT) by the Massachusetts Department of Public Health.

20. Mr. Boyle has worked as a Springfield Park Ranger since 2012, and in July 2013, Mr. Boyle was promoted to the rank of Sergeant.

21. Mr. Boyle also worked as a Special Police Officer for the City of West Springfield from 2012 until October 2014, when the unit was disbanded. From September 2012 until August of 2014, Mr. Boyle held the rank of Patrolman. From August 2014 to October 2014, he was promoted to the rank of Sergeant.

22. Mr. Boyle was previously employed as a Residential Caseworker for the Key Program, Inc. from December 2013 through November of 2014. The facility in which he

worked was a staff secure facility for young people who had been committed to the custody of the Massachusetts Department of Youth Services (DYS).

23. Mr. Boyle is presently employed as a Police Officer for the Town of Hatfield, where he have been employed since September 2014, and as a Social Worker for the Massachusetts Department of Children and Families, where he have been employed since November 2014.

**B. MR. BOYLE'S DISABILITY**

24. In 2008, Mr. Boyle was diagnosed with Single Sided Deafness (SSD) in his right ear.

25. The hearing loss in his right ear substantially interfered with a number of his daily life activities, including his ability to hear and communicate with others. Mr. Boyle had difficulty hearing and understanding what was being said around him in noisy environments. Even in quiet environments, Mr. Boyle had difficulty hearing sounds, particularly higher frequency sounds, and understanding conversations occurring on his right side. Mr. Boyle found that he would concentrate so hard on hearing that he would often fail to discern the content or meaning of what was being said. Mr. Boyle also had difficulty localizing sound and identifying where sounds were originating. Along with the hearing loss, Mr. Boyle also experienced problems with balance and symptoms associated with vertigo.

26. In 2010, with assistance from the Massachusetts Rehabilitation Commission, Mr. Boyle underwent surgery to implant a Bone Anchored Hearing Aid (BAHA). The BAHA is a bone conducting hearing prosthesis that transmits sounds to the inner ear of his functioning left ear. Mr. Boyle had previously received an in-the-ear hearing aid from Mass. Rehab. in 2009, but after finding it wasn't as effective as he had hoped, he went forward with the surgery.

27. Although the BAHA device has helped restore the sensation of hearing through his right ear, certain types of prolonged physical exertion still cause him to experience severe vertigo. Mr. Boyle am particularly susceptible to vertigo after running for prolonged distances.

28. When Mr. Boyle suffers from vertigo, he experiences extreme dizziness, nausea, vomiting and disorientation. Mr. Boyle is unable to visually focus on stationary objects. Mr. Boyle becomes extremely unsteady on his feet, and he is at risk of falling hard to the ground and/or blacking out.

29. The periods of vertigo Mr. Boyle sometimes experiences during extreme exertion vary in severity and duration. On some occasions, Mr. Boyle is able to return to the physical activity after a relatively brief period of rest. On other occasions, the vertigo persists and Mr. Boyle is required to discontinue the physical exertion for a longer period of time.

**C. COMPLAINANT'S EMPLOYMENT & TERMINATION BY THE DEFENDANT**

30. Mr. Boyle applied for a position as a Correctional Officer with the Sheriff's Office in March 2014 and he was hired as a Recruit Candidate by the Sheriff's Office in early May 2014.

31. Recruits are required to attend and successfully complete the Franklin County Sheriff's Office Correctional Officer Training Academy in order to receive a permanent appointment as a Correctional Officer.

32. The seven week Training Academy began on May 12, 2014, and encompassed an assortment of physical and academic components.

33. Portions of each training day were devoted to physical training designed to increase the strength and physical conditioning of recruits, and included long distance runs,

sprints, agility exercises and certain stationary exercises, such as push-ups, sit ups, leg lifts, and planks.

34. As part of the physical component of the training, recruits were required to pass a physical training test. In particular, recruits were tested on their ability to meet established minimum standards based on age and gender in six different categories of physical conditioning, including body fat, sit ups, sit and reach, push-ups, 1.5 mile run and agility.

35. Recruits were given weekly opportunities during the seven weeks of the Academy to pass the physical test. There was no defined limitation as to how many times a recruit could fail the exam. Recruits were required to pass the test before the end of the Academy.

36. The test was first administered on the second day of the Academy, and a majority of the recruits, including Mr. Boyle, did not pass the test.

37. Mr. Boyle succeeded in passing the test the third time it was given.

38. Although Mr. Boyle was ultimately able to pass the physical test and surpass the minimum standards of fitness required by the Sheriff's Office to become a Correctional Officer, Mr. Boyle encountered serious problems with certain aspects of the physical training which were directly related to his disability.

39. From the beginning of the Training Academy, Mr. Boyle experienced varying degrees of vertigo during the long distance physical training runs and other periods of physical exertion. On certain occasions, Mr. Boyle was able to endure the dizziness and complete the physical activity, sometimes with the assistance and encouragement of his fellow recruits.

40. However, on other occasions, the vertigo Mr. Boyle experienced during these periods of physical exertion was so severe that Mr. Boyle could not continue. On these

occasions, Mr. Boyle would suspend his physical efforts and attempt to rest until the vertigo subsided, and then resume the physical training.

41. Prior to the start of the Training Academy, and at various times during the course of the Academy, Sheriff's Office instructors and superior officers were fully apprised of the nature of Mr. Boyle's disability and the limitations it imposed upon him.

42. Prior to the start of the Academy, recruits were required to undergo an independent medical examination, the results of which were provided to the Sheriff's Office. During the examination conducted by AEIOU Healthcare in Greenfield Mr. Boyle explained to the examining doctor his hearing loss and use of the BAHA device.

43. On multiple occasions following the start of the Academy, Mr. Boyle advised Sheriff's Office Instructors and superior officers orally and in writing of the problems Mr. Boyle was experiencing with vertigo on the physical training runs.

44. For example, in a Daily Report submitted to superior officers on May 19, 2014, Mr. Boyle stated: "This recruit is also experiencing some dizziness still, which he believes is related to a vestibular issue due to his ear problems on the right side."

45. Similarly, in his Daily Report for May 20, 2014, Mr. Boyle advised the training instructors that "[b]etween the 4th and 5th lap, this recruit had to drop out of the run due to an ongoing issue with dizziness, which this recruit now understands to be vertigo."

46. After falling out of the training run on May 20, 2014, Mr. Boyle spoke with one of the training instructors, Lt. Lehtomaki, and again informed him that Mr. Boyle had to stop running because of extreme dizziness that Mr. Boyle believed was related to the deafness in his right ear.

47. At Lt. Lehtomaki's suggestion, Mr. Boyle went to see the on-site nurse practitioner and explained the problems he was having with vertigo during the training runs. She advised him to see his primary care physician and obtain a prescription for meclizine, a medication intended to alleviate the symptoms of motion sickness.

48. On the advice of the nurse practitioner, Mr. Boyle went to see his primary care physician on May 20, 2014, and his doctor diagnosed the problem as vertigo associated with his SSD, and gave him a prescription for meclizine. The doctor also provided Mr. Boyle with a note stating that Mr. Boyle was suffering from vertigo and that Mr. Boyle had been prescribed meclizine.

49. Unfortunately, the meclizine did not effectively alleviate the severe vertigo Mr. Boyle continued to experience during physical training. In his Daily Report to his superior officers on May 21, 2014, Mr. Boyle noted:"This recruit is very disappointed that he was unable to complete today's PT run due to ongoing issues with vertigo."

50. On May 21, 2014, Mr. Boyle again spoke with Lt. Lehtomaki and provided him with a copy of the note Mr. Boyle had been given by his primary care physician.

51. Mr. Boyle again mentioned the ongoing problems he was having with severe vertigo during the long distance training runs, and specifically requested that he be given an alternative cardiovascular exercise, such as using a stationary bike, so as to avoid the issues he was having with the running.

52. Mr. Boyle requested this accommodation because he believed that a stationary form of cardiovascular exercise would enable him to push through any continuing episodes of vertigo without the risk of falling and seriously injuring myself or other recruits who might trip over him.

53. In his Daily Report for May 23, 2014, Mr. Boyle reminded his superior officers that he had "asked for reasonable accommodation in terms of alternate exercise for cardiovascular training so as to avoid further issues with vertigo."

54. The following day, on May 24, 2014, Mr. Boyle passed the physical training exam and demonstrated his ability to surpass the minimum standards of physical conditioning required by the Sheriff's Office for permanent Correctional Officers.

55. On May 28, 2014, Mr. Boyle was called into a meeting with four superior officers to discuss his request for a reasonable accommodation. Mr. Boyle was given only two options at this meeting: he could either continue to participate in the physical training with the other recruits, or he could spend the physical training time in the central control area of the House of Corrections.

56. Mr. Boyle recognized that the physical training was an important part of building team spirit and comradery among the recruits and was important to building strength and conditioning, and Mr. Boyle did not want to be deprived of these opportunities.

57. Mr. Boyle was also assured at this meeting that it would not be held against him if Mr. Boyle was unable to complete long distance training runs so long as Mr. Boyle was giving it his best effort.

58. Based on the above considerations and representations, Mr. Boyle opted to continue with the physical training.

59. Before applying for the correctional officer position, Mr. Boyle understood that the training academy was paramilitary in nature and conducted in a boot camp-like atmosphere, and Mr. Boyle anticipated a certain amount of verbal and physical pressure from instructors.

60. However, after Mr. Boyle informed superior officers of the disability-related problems he was experiencing and sought an appropriate accommodation, Mr. Boyle became the subject of targeted abuse and harassment that was far more severe than the routine hazing treatment directed at other recruits.

61. After inquiring about being granted an accommodation, Mr. Boyle was subjected by superior officers to degrading and humiliating treatment which was persistent and unrelenting.

62. Mr. Boyle was told that he was a “pathetic hire” and repeatedly told that he should quit.

63. Mr. Boyle was accused in front of other recruits of faking his disability.

64. Mr. Boyle was told that the vertigo he claimed to be experiencing was just an excuse for not completing the physical training.

65. While doing push-ups, an instructor grabbed his waistband and underwear and yanked his body up and down while yelling, “Is that helping you, you weak piece of shit.”

66. On May 29, 2014, Mr. Boyle resolved that he needed to speak with Capt. Troczynski about what Mr. Boyle believed to be discrimination based upon his disability.

67. Another recruit offered to accompany him to Capt Troczynski’s office, but the Captain was not in his office when they arrived, and Mr. Boyle was unable to speak with him.

68. Later that afternoon, the other recruit and Mr. Boyle were called over to a group of training instructors and questioned about the reasons they had sought to speak with Capt. Troczynski. Mr. Boyle explained that he had wanted to speak with Capt. Troczynski because Mr. Boyle believed he was being subjected to disability-based discrimination.

69. At the end of the following day, May 30, 2014, Mr. Boyle was called into the office of Assistant Superintendent Lori Street and his employment with the Sheriff's Office was terminated.

## FIRST CLAIM FOR RELIEF: DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF 42 U.S.C. § 12112

70. Plaintiff Timothy Boyle repeats the allegations set forth in paragraphs 1 through 69 above, and incorporates those allegations as if fully set forth herein.

71. Mr. Boyle is a qualified individual within the meaning of 42 U.S.C. § 12111(8).

72. The Sheriff's Office failed and refused to enter into and participate in a good faith dialogue regarding the accommodation Mr. Boyle needed in order to successfully complete the Training Academy and become a permanent Correctional Officer.

73. The Sheriff's Office failed to provide Mr. Boyle with a reasonable accommodation of his hearing disability and associated vertigo.

74. Mr. Boyle was at all times able to perform the essential tasks assigned to recruit candidates and the essential functions of a permanent Correctional Officer with reasonable accommodations.

75. While a certain level of physical and cardiovascular conditioning may be necessary in order to perform the essential functions of a permanent Correctional Officer, long distance running is not a bona fide occupational requirement for this position.

76. The imposition on recruits of physical requirements which are not bona fide occupational requirements for permanent correctional officer positions has a disparate negative impact on individuals like Mr. Boyle with physical disabilities.

77. The Sheriff's Office never conducted an individualized assessment of Mr. Boyle's ability to perform the tasks required of a permanent Correctional Officer.

78. The failure and refusal of the Sheriff's Office to provide Mr. Boyle with reasonable accommodations which would have enabled him to continue his employment constitutes illegal discrimination against Mr. Boyle on the basis of his disability in violation of the Americans with Disabilities Act (hereafter "ADA"), as codified at 42 U.S.C. §12112.

79. The termination of Mr. Boyle's employment by the Sheriff's Office was the result of illegal discrimination against him on the basis of his disability in violation of the ADA, as codified at 42 U.S.C. §12112.

80. The discriminatory actions and omissions of the Defendant have caused and continue to cause Mr. Boyle to suffer substantial damages for lost wages and income, the loss of employment benefits, and other pecuniary losses, as well as mental anguish and humiliation, emotional distress, the loss of enjoyment of life, and other nonpecuniary losses.

## SECOND CLAIM FOR RELIEF: DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF M.G.L. c. 151b, § 4(16)

81. Plaintiff Timothy Boyle repeats the allegations set forth in paragraphs 1 through 80 above, and incorporates those allegations as if fully set forth herein.

82. Mr. Boyle is a qualified handicapped person within the meaning of M.G.L. c. 152, § 75B(1) and M.G.L. c. 151B, § 4(16).

83. The failure and refusal of the Sheriff's Office to provide Mr. Boyle with reasonable accommodations which would have enabled him to continue his employment

constitutes illegal discrimination against Mr. Boyle on the basis of his disability in violation of M.G.L. c. 151B, § 4(16).

84. The termination of Mr. Boyle's employment by the Sheriff's Office was the result of illegal discrimination against him on the basis of his disability in violation of M.G.L. c. 151B, § 4.

85. The discriminatory actions and omissions of the Defendant have caused and continue to cause Mr. Boyle to suffer substantial damages for lost wages and income, the loss of employment benefits, and other pecuniary losses, as well as mental anguish and humiliation, emotional distress, the loss of enjoyment of life, and other nonpecuniary losses.

## THIRD CLAIM FOR RELIEF: RETALIATION IN VIOLATION OF 42 U.S.C. § 12203

86. Plaintiff Timothy Boyle repeats the allegations set forth in paragraphs 1 through 85 above, and incorporates those allegations as if fully set forth herein.

87. The Sheriff's Office retaliated against Mr. Boyle for asserting his rights under the Americans with Disabilities Act in violation of Section 503(a) of the ADA, 42 U.S.C. § 12203.

88. The retaliatory actions of the Defendant have caused and continue to cause Mr. Boyle to suffer substantial damages for lost wages and income, the loss of employment benefits, and other pecuniary losses, as well as mental anguish and humiliation, emotional distress, the loss of enjoyment of life, and other nonpecuniary losses.

FOURTH CLAIM FOR RELIEF:
DISCRIMINATORY RETALIATION IN VIOLATION
OF M.G.L. C. 151B, § 4(4)

89. Plaintiff Timothy Boyle repeats the allegations set forth in paragraphs 1 through 88 above, and incorporates those allegations as if fully set forth herein.

90. The Defendant discriminated against Mr. Boyle because he resisted and opposed its persistent failure and refusal to provide him with reasonable accommodations, in violation of M.G.L. c. 151B, § 4(4).

91. The retaliatory actions of the Defendant have caused and continue to cause Mr. Boyle to suffer substantial damages for lost wages and income, the loss of employment benefits, and other pecuniary losses, as well as mental anguish and humiliation, emotional distress, the loss of enjoyment of life, and other nonpecuniary losses.

**PRAYER FOR RELIEF**

Plaintiff Timothy Boyle prays the Court to grant him the following relief:

1. That the Plaintiff be awarded appropriate injunctive relief designed to ensure that the Defendant discontinues its discriminatory and retaliatory practices.

2. That the Plaintiff be awarded compensatory damages in an amount to be determined at trial in this matter, plus statutory interest on any such award.

3. That the Plaintiff be awarded punitive damages in an amount to be determined at trial in this matter.

4. That the Plaintiff be awarded reasonable attorney's fees, together with litigation expenses and costs of suit.

5. That the Plaintiff be awarded such other relief as the Court deems just and proper.

DEMAND FOR JURY

Plaintiff Timothy Boyle demands trial by jury on all triable issues.

Respectfully submitted,

PLAINTIFF TIMOTHY BOYLE
By his attorney,

Dated: January 8, 2016

/s/ Hugh D. Heisler

Hugh D. Heisler
BBO # 563925
Heisler, Feldman & McCormick, P.C.
293 Bridge Street, Suite 322
Springfield, MA 01103
P: (413) 788-7988
Fax: (413) 788-7996
hheisler@hfmgpc.com